UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HYLAND STEVEN STERLING,

                Petitioner,                Case No. 1:11-cv-427

v.                                       Honorable Paul L. Maloney

MARY BERGHUIS,

                Respondent.

_____/

## OPINION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Following a jury trial in the Kalamazoo County Circuit Court, on April 14, 2006, Petitioner Hyland Steven Sterling was convicted of first-degree felony-murder, MICH. COMP. LAWS § 750.316b, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b.  On May 8, 2006, he was sentenced to a term of life imprisonment on the murder conviction consecutive to a sentence of two years on the felony-firearm conviction.

        Petitioner appealed his convictions to the Michigan Court of Appeals raising five main issues (Issues I-V below).  In an unpublished opinion issued April 22, 2008, the court of appeals affirmed the convictions.  Petitioner filed an application seeking leave to appeal to the Michigan Supreme Court, raising the same issues.  In an order issued September 9, 2008, the supreme court denied Petitioner's application for leave to appeal.

Petitioner then returned to the trial court. He filed a motion for relief from judgment raising six grounds for relief (Issues VI-XI below). The court denied the motion by order dated October 30, 2009. Petitioner sought leave to appeal, raising the same six issues, in the Michigan Court of Appeals and then the Michigan Supreme Court. Those courts denied leave by orders entered August 18, 2010 and March 30, 2011, respectively.

In his habeas petition, filed on April 27, 2011, Petitioner raises the same eleven issues he raised in the state courts:

I.      REVERSIBLE ERROR OCCURRED WHERE THE JURY'S VERDICT WAS AGAINST THE GREAT WEIGHT OF EVIDENCE.

II.     DEFENDANT'S TRIAL COUNSEL MADE CRITICAL ERRORS DURING TRIAL WHICH PREJUDICED DEFENDANT AND DENIED HIM A FAIR TRIAL AND EFFECTIVE ASSISTANCE OF COUNSEL.

       A.      TRIAL COUNSEL WAS INEFFECTIVE BECAUSE OF HIS FAILURE TO CONDUCT AN INVESTIGATION TO DETERMINE IF KNOWN WITNESSES HAD DIRECT EVIDENCE TO SUBSTANTIATE HIS DEFENSE AND COUNSEL HAVE DONE SO IF HE HAD MOVED FOR A HEARING OF DUE DILIGENCE ON HIS MOTION FOR ASSISTANCE BUT FAILED TO DO SO.

       B.      TRIAL COUNSEL WAS INEFFECTIVE BECAUSE HE HAD FAILED TO CHALLENGE THE USE BY THE PROSECUTOR OF OTHER BAD ACTS COMMITTED BY DEFENDANT.

       C.      TRIAL COUNSEL WAS INEFFECTIVE BECAUSE HE FAILED TO HAVE THE JURY MADE AWARE THAT THE PHOTOGRAPH OF EXHIBIT 5 OF DEFENDANT USED AT TRIAL WAS TAKEN SOME YEARS AFTER THE HOMICIDE, WHERE THE LENGTH OF DEFENDANT'S HAIR WAS AN ISSUE AT TRIAL.

       D.      TRIAL COUNSEL WAS INEFFECTIVE BECAUSE HE FAILED TO CHALLENGE THE PHOTOGRAPHS OF THE DECEASED WHEN CAUSE OF DEATH WAS NOT AN ISSUE.

E.      TRIAL COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO CALL A CRITICAL WITNESS AT TRIAL.

III.      HICOK'S TESTIMONY WOULD HAVE BEEN CRITICAL FOR DEFENDANT'S DEFENSE. TRIAL COUNSEL'S FAILURE TO PRESENT HER TO THE JURY DENIES DEFENDANT A FAIR TRIAL. DEFENDANT WAS DENIED A FAIR TRIAL BECAUSE EVIDENCE PRESENTED AT HIS TRIAL WAS INSUFFICIENT TO ESTABLISH THE ELEMENTS OF FIRST DEGREE FELONY MURDER.

IV.      THE PROSECUTION FAILED TO USE DUE DILIGENCE TO ASSIST THE DEFENDANT TO PRODUCE THE RES GESTAE WITNESS, BABBIE BOOKER AS A WITNESS AT TRIAL WHICH DENIED HIM THE ABILITY TO PRESENT A VALID DEFENSE AT TRIAL WHICH SHOULD HAVE RESULTED IN HIS ACQUITTAL AND THE TRIAL COURT ERRED WHEN IT SHIFTED THE BURDEN TO DEFENDANT TO FIND HIS WITNESS.

V.      THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT RULED MS BOOKER'S TESTIMONY WAS NOT CREDIBLE, DEFENDANT WAS NOT PREJUDICED BY THE FAILURE TO HAVE MS BOOKER'S TESTIMONY PRESENTED TO THE JURY BY DENYING THE MOTION FOR A NEW TRIAL.

VI.      TRIAL COURT VIOLATED THE SIXTH AMENDMENT CONFRONTATION CLAUSE BY ADMITTING NON-TESTIFYING, FORENSIC PATHOLOGIST, DR HARVEY WILKES' AUTOPSY REPORT AND ALLOWING A DIFFERENT FORENSIC PATHOLOGIST DR. JOYCE DEJONG TO GIVE OPINIONS AND DRAW CONCLUSIONS AS TO THE AUTOPSY PERFORMED BY THE NON-TESTIFYING FORENSIC PATHOLOGIST.

VII.      DEFENDANT SIXTH AMENDMENT RIGHT TO A FAIR TRIAL AND RIGHT TO CONFRONTATION AND HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO PRESENT A DEFENSE WERE VIOLATED WHEN THE TRIAL JUDGE ERRONEOUSLY RULED THAT THE PROSECUTION EXERCISED GOOD FAITH AND DUE DILIGENCE IN HIS FAILURE TO PRODUCE WITNESS JAMES RUSHMORE.

VIII.     DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL

A.    TRIAL COUNSEL WAS INEFFECTIVE (1) FOR FAILURE TO OBJECT TO THE ADMISSION OF DOCTOR HARVEY'S AUTOPSY REPORT (2) FOR FAILURE TO OBJECT TO THE ADMISSION OF THE TESTIMONY OF FORENSIC PATHOLOGIST DOCTOR JOYCE DEJONG.

B.    TRIAL COUNSEL WAS INEFFECTIVE FOR HIS FAILURE TO REQUEST A MISSING WITNESS INSTRUCTION.

IX.    THE PROSECUTOR'S MISCONDUCT DENIED DEFENDANT A FAIR TRIAL IN VIOLATION OF HIS FOURTEENTH AMENDMENT RIGHTS

A.    THE PROSECUTOR FAILED TO MEET ITS OBLIGATION TO PRODUCE WITNESS JAMES RUSHMORE[.]

B.    Left Blank][1]

C.    THE PROSECUTOR PERSONALLY VOUCHED FOR THE CREDIBILITY OF WITNESS JAMES RUSHMORE.

D.    THE PROSECUTOR ARGUED FACTS NOT IN EVIDENCE.

E.    THE PROSECUTOR'S IMPROPER ACTIONS CREATED REVERSIBLE ERROR WHETHER THEY ARE CONSIDERED SEPARATELY OR IN THEIR SUM TOTAL.

F.    "HARMLESS ERROR," A RATIONAL VIEW OF THE EVIDENCE, OR A SIMILAR ARGUMENT SHOULD NOT BE APPLICABLE.

X.    THE EVIDENCE FAILED TO SUPPORT THE JURY'S DETERMINATION THAT ROBERT O'KEEFE WAS MURDERED DURING THE COMMISSION OF A LARCENY.

XI.    DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE [OF COUNSEL] ON APPEAL WHEN APPELLATE COUNSEL FAILED TO RAISE MERITORIOUS ISSUES.

---

[1]Petitioner begins his lettering of issues under the general category "IX Prosecutorial Misconduct" with issue "C" regarding vouching. (ECF No. 1-1, PageID.71.) Immediately preceding his argument regarding vouching, however, he raises an issue regarding the prosecutor's failure to produce witness James Rushmore. (*Id.*, PageID.69-71.) That issue is designated "A" herein. There is no issue "B."

-4-

(Pet. Attach. F, ECF No. 1-1, PageID.33-80.) On November 14, 2011, Respondent filed an answer to the petition (ECF No. 5), stating that the grounds should be denied because they are procedurally defaulted and/or without merit.  On November 29, 2011, Respondent filed the state-court record, pursuant to Rule 5, RULES GOVERNING § 2254 CASES.  (ECF No. 6-39.)[2]  Upon review and applying the standards from the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA), the Court finds that all habeas grounds are meritless.  Accordingly, the Court will deny the petition for failure to raise a meritorious federal claim.

---

[2]The Rule 5 materials include several transcripts of the trial court proceedings.  The transcripts shall be referenced as follows:

| | |
|---|---|
| Dec. 23, 2004 Probable Cause Hearing | (Probable Cause Hr'g Tr., ECF No. 8, p.__) |
| Dec. 29, 2004 Arraignment | (Arraignment Tr., ECF No. 9, p.__) |
| Feb. 11, 2005 Preliminary Exam. Vol. I | (Prelim. Examination Tr. I, ECF No. 10, p.__) |
| Feb. 11, 2005 Preliminary Exam. Vol. II | (Prelim. Examination Tr. II, ECF No. 11, p.__) |
| June 15, 2005 Preliminary Exam. Supp. | (Prelim. Examination Supplemental Tr., ECF No. 12, p.__) |
| Aug. 15, 2005 Trial Transcript Vol. I | (Trial I Tr. I, ECF No. 13, p.__) |
| Aug. 16, 2005 Trial Transcript Vol. II | (Trial I Tr. II, ECF No. 14, p.__) |
| Aug. 17, 2005 Trial Transcript Vol. III | (Trial I Tr. III, ECF No. 15, p.__) |
| Aug. 18, 2005 Trial Transcript Vol. IV | (Trial I Tr. IV, ECF No. 16, p.__) |
| Aug. 19, 2005 Trial Transcript Vol. V | (Trial I Tr. V, ECF No. 17, p.__) |
| Aug. 23, 2005 Trial Transcript Vol. VI | (Trial I Tr. VI, ECF No. 18, p.__) |
| Aug. 24, 2005 Trial Transcript Vol. VII | (Trial I Tr. VII, ECF No. 19, p.__) |
| Dec. 21, 2005 Motion to Quash Hearing | (Mot. Hr'g Tr., ECF No. 20, p.__) |
| Apr. 4, 2006 Trial Transcript Vol. I | (Trial II Tr. I, ECF No. 21, p.__) |
| Apr. 5, 2006 Trial Transcript Vol. II | (Trial II Tr. II, ECF No. 22, p.__) |
| Apr. 6, 2006 Trial Transcript Vol. III | (Trial II Tr. III, ECF No. 23, p.__) |
| Apr. 7, 2006 Trial Transcript Vol. IV | (Trial II Tr. IV, ECF No. 24, p.__) |
| Apr. 11, 2006 Trial Transcript Vol. V | (Trial II Tr. V, ECF No. 25, p.__) |
| Apr 12, 2006 Trial Transcript Vol. VI | (Trial II Tr. VI, ECF No. 26, p.__) |
| Apr. 13, 2006 Trial Transcript Vol. VII | (Trial II Tr. VII, ECF No. 27, p.__) |
| Apr. 14, 2006 Trial Transcript Vol. VIII | (Trial II Tr. VIII, ECF No. 28, p.__) |
| May 8, 2006 Sentencing Transcript | (Sentencing Tr., ECF No. 29, p.__) |
| Mar. 9, 2007 New Trial Motion Vol. I | (New Trial Mot. Hr'g Tr. I, ECF No. 30, p.__) |
| Mar. 21, 2007 New Trial Motion Vol. II | (New Trial Mot. Hr'g Tr. II, ECF No. 31, p.__). |

**Factual Allegations**

On July 25, 1995, Christina Laing left her home at 829 Oakwood in Kalamazoo, Michigan, to work the lunch shift at Don Neal's restaurant.  (Trial II Tr. II, ECF No. 22, p. 231-232, 236-237.) When she walked out at 10:30, she left behind her boyfriend, Robert O'Keefe, sleeping in their bed, and the dog they owned together.  (*Id*., p. 252-253, 270.)  When she returned at around 2:30 p.m., she found the dog had been shut in the bedroom with Robert.  (*Id*., p. 256-258.)   When she could not rouse Robert, she realized he was dead; he had been shot in the head.  (*Id*.)  The only things that appeared to be missing were her sister's backpack, and the briefcase that was typically locked up in the trunk of Robert's car. (*Id*., p. 269.)  That briefcase had contained thousands of dollars in cash and a .44 caliber handgun.  (*Id*., p. 265, 272, 303.)  Robert had been shot with a .44.  (*Id*., p. 350.)

Petitioner and Robert were coworkers and best friends.  (Trial II Tr. VII, ECF No. 27, p. 843; Trial II Tr. II, ECF No. 22, p. 238-239.) Several weeks prior to Robert's murder, Petitioner and Robert, with the assistance of Robert's sister Tricia Emme, had robbed a bank.  (Trial II Tr. IV, ECF No. 24, p. 618-620.)  The robbery yielded no gains for the participants because Robert and Petitioner were forced to abandon their ill-gotten gains when the dye pack "went off."  (*Id*.)  The robbery was, at least in part, an effort by Robert and Petitioner to generate funds so that they might purchase a Kalamazoo bar known as "The Warehouse."  (*Id*., p. 617-618.)

After Robert's murder, Tricia reported what she knew about the robbery to law enforcement.  (*Id*., p. 621-622.)  She wore a wire and, because of that effort, produced evidence of Petitioner's role in the robbery.  (*Id*., p. 640.)  Petitioner was arrested for his role in the bank robbery less than four weeks after Robert's murder.  *See* Arrest Warrant, *United States v. Sterling*, No. 1:95-cr-127

(W.D. Mich. Aug. 21, 1995). Petitioner pleaded guilty to bank robbery and was sentenced to 72 months

imprisonment and two years of supervised release. *United States v. Sterling*, No. 96-1482, 1996 WL

708350 at *1 (6th Cir. Dec. 6, 1996).

The cold case team in Kalamazoo County renewed the murder investigation in March of

2004. (Trial II Tr. V, ECF No. 25, p. 752.) The circumstantial evidence they gathered led the cold case

team to seek arrest warrants for Petitioner as Robert's killer. (Probable Cause Hr'g Tr., ECF No. 8) The

prosecutor first tried Petitioner for Robert's murder in August of 2005. (Trial I Tr. I-VII, ECF No. 13-

19.) That trial resulted in a "hung" jury: 10 jurors voted for acquittal, 2 for conviction. (New Trial Mot.

Hr'g Tr. I, ECF No. 30, p. 24.) Petitioner's second trial, during April of 2006, resulted in the convictions

and sentences outlined above.

The evidence presented by the prosecution was circumstantial and a full exploration of the

circumstances surrounding Robert's death took several days of testimony from 27 witnesses. The defense

presented the testimony of 13 witnesses, including Petitioner. The Michigan Court of Appeals distilled the

volumes of testimony to the following concise statement of facts:

> The evidence at trial established that defendant and O'Keefe planned to purchase
> a bar known as The Warehouse. Defendant knew that an investor had given O'Keefe a
> large sum of money to invest in the purchase, but was pressuring him to return the money.
> The investor's attorney testified that he was in the process of arranging for repayment of
> the money. Another witness testified that a few days before O'Keefe's death, defendant
> was looking for O'Keefe and was angry because he believed that O'Keefe was backing
> out of the deal to buy The Warehouse. James Rushmore, defendant's former cellmate,
> testified that defendant told him that one of his associates was killed for backing out of the
> deal to purchase The Warehouse.
>
> Defendant admitted that he saw O'Keefe retrieve money, which he assumed was
> part of the investment money, from O'Keefe's car trunk on the night before the offense.
> Further, Christina Laing, O'Keefe's live-in girlfriend, stated that defendant was with her,

-7-

standing at the trunk of O'Keefe's car, when O'Keefe took a large sum of the money from a briefcase and split it with defendant about a month before the offense. Defendant admitted receiving the money. The bullets recovered from O'Keefe's body were .44-caliber, and witnesses testified that O'Keefe owned a .44-caliber handgun. Tricia Emme, O'Keefe's sister, testified that during an earlier bank robbery committed by defendant and O'Keefe, defendant carried O'Keefe's .44-caliber handgun. Christina Laing and O'Keefe's mother both testified that O'Keefe always kept his guns in his briefcase, which was always in his car trunk. Laurie Laing, one of O'Keefe's roommates, testified that when O'Keefe showed her the investment money in his briefcase, she saw the .44-caliber handgun in it. Defendant admitted that he knew that O'Keefe owned two guns. From this evidence, the jury could reasonably infer that defendant was aware that O'Keefe kept the large sum of money and his guns in his briefcase, which was kept in the trunk of his car. The jury could also infer that the .44-caliber gun in O'Keefe's briefcase was the weapon that was used to shoot O'Keefe.

Christina Laing testified that on July 25, 1995, the day of the offense, O'Keefe was alive when she left the house at 10:30 a.m. and was dead when she returned around 2:30 p.m. Officer Higby testified that he arrived at the house at 2:38 p.m. There was conflicting evidence whether gunshots were heard before or after noon. Defendant did not have an alibi for the morning hours. Justin Roettger, O'Keefe's neighbor, saw a man matching defendant's general description looking into a car in O'Keefe's driveway on the morning of the offense. He drew a sketch of the shirt that the man was wearing. Three witnesses identified the shirt as similar to one they had seen defendant wear. Roettger testified that when he saw defendant at the house later that day, he looked like the man he saw earlier, except that his hair was shorter. Emme stated that defendant had said that he cut his hair that day. Several witnesses testified that defendant did not always have a clean-shaven head. Furthermore, defendant's fingerprints were found on both sides of O'Keefe's car, as well as the trunk. From this evidence, the jury could reasonably infer that defendant was the person who was observed outside O'Keefe's house on the morning of the offense, during a time span for which defendant did not have an alibi.

Christina Laing also testified that defendant overheard her tell O'Keefe that she had to work on the day of the offense. It was undisputed that defendant and O'Keefe were good friends at the time. The jury could have reasonably inferred that defendant knew that O'Keefe's other roommates and Christina Laing would be at work at the time of the offense. Although there was no direct evidence that defendant had been in the upstairs portion of the home before O'Keefe was killed, Christina and Laurie Laing both testified that defendant came up the stairs on the night of the offense looking for O'Keefe's blue book. Christina Laing also testified that defendant had been to O'Keefe's house before and sat near the kitchen table where the roommates kept their car keys and where Laurie Laing left her backpack. O'Keefe's briefcase where he kept his money and Laurie

-8-

Laing's backpack were both missing after O'Keefe was killed. Additionally, both items were found in a dumpster near the two places that established defendant's afternoon alibi. Furthermore, defendant asked his live-in girlfriend, Laura Schmidt, to move his own briefcase before the police searched his home, and Rushmore testified that defendant admitted to being at the scene when O'Keefe was shot. From this evidence, the jury could reasonably infer that defendant was familiar with O'Keefe's house, was aware that O'Keefe would be the only person at the house on the morning of the offense, and knew where the car keys were kept, giving him access to O'Keefe's car where O'Keefe kept his briefcase.

The foregoing evidence and reasonable inferences arising from the evidence, viewed in a light most favorable to the prosecution, is sufficient to enable the jury to determine beyond a reasonable doubt that defendant was the person who murdered O'Keefe during the commission of a larceny. A person matching defendant's description was seen looking into O'Keefe's car, on which defendant's fingerprints were found, near the time of the offense. Defendant had no alibi for the morning hours, which were within the timeframe in which the offense could have been committed. There was also evidence that defendant knew where O'Keefe kept his car keys, knew O'Keefe would be alone at the time of the offense, and knew where O'Keefe kept his guns and the investment money. O'Keefe was killed with the same caliber handgun as the one he kept in his briefcase. The briefcase and Laurie Laing's backpack were both taken from the scene. These items were recovered in the vicinity of defendant's afternoon alibi, but O'Keefe's money and the .44-caliber handgun that were inside the briefcase were never recovered. Finally, defendant's former cellmate testified that defendant made statements indicating that an associate was killed for backing out of the deal to purchase The Warehouse. Although defendant argues that many of the witnesses against him were biased, the credibility of the witnesses was for the jury to resolve. The evidence was sufficient to support defendant's convictions.

*People v. Sterling*, No. 270838, 2008 WL 1810318 at *1-3 (Mich. Ct. App., April 22, 2008) (footnote omitted).

## Discussion

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is

limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

I.     Sufficiency of the evidence (Habeas issues I and X)

Petitioner contends that the evidence presented by the prosecutor was insufficient in at least two respects: first, the prosecutor failed to show that Petitioner caused the death of Robert O'Keefe (habeas issue I); and second, the prosecutor failed to show that Robert O'Keefe's death was caused during the commission of a larceny (habeas issue X).  A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401 02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.  Moreover, because both the Jackson standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case:  First, deference should be given to the trier of fact's verdict, as contemplated by Jackson; second, deference should be given to the Michigan [trial court's] consideration of the trier of fact's verdict, as dictated by

-12-

AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Tucker v. Palmer*,

541 F.3d 652, 656 (6th Cir. 2008)).  This standard erects "a nearly insurmountable hurdle" for petitioners

who seek habeas relief on sufficiency of the evidence grounds.  *Id.* at 534 (quoting *United States v. Oros*,

578 F.3d 703, 710 (7th Cir. 2009)).

      The Michigan Court of Appeals applied the *Jackson* standard:

> In reviewing a challenge to the sufficiency of the evidence, this Court must view the
> evidence in the light most favorable to the prosecution and determine whether a rational
> trier of fact could find that the essential elements of the crime were proven beyond a
> reasonable doubt.  *People v. Wilkens*, 267 Mich.App. 728, 738, 705 N.W.2d 728
> (2005).  This Court should not interfere with the factfinder's role of determining the weight
> of evidence or the credibility of witnesses.  *People v. Wolfe*, 440 Mich. 508, 514, 489
> N.W.2d 748 (1992), amended 441 Mich. 1201, 489 N.W.2d 748 (1992).  This Court
> recognizes that it is the jurors' role to determine what inferences can be fairly drawn from
> the evidence, and to determine the weight to be accorded to the inferences.  *People v.
> Hardiman*, 466 Mich. 417, 428, 646 N.W.2d 158 (2002).  Circumstantial evidence and
> reasonable inferences arising from the evidence can constitute satisfactory proof of the
> elements of the crime.  *People v. Fennell*, 260 Mich.App. 261, 270, 677 N.W.2d 66
> (2004).  All conflicts in the evidence must be resolved in favor of the prosecution.  *People
> v. Fletcher*, 260 Mich.App. 531, 562, 679 N.W.2d 127 (2004).

*Sterling*, 2008 WL 1810318 at *1.[3]  Thus, it cannot be said that the standard applied by the court of

appeals was contrary to clearly established federal law.

      After stating the standard, the court of appeals applied it appropriately.  The court carefully

reviewed the evidence, considering that evidence in a light most favorable to the prosecution.  The court's

entire analysis is quoted above.  *See* p. 7-9, infra.  The analysis on its face is consistent with, not contrary

---

    [3]Each of the cases cited by the Michigan Court of Appeals either cites *People v. Wolfe*, 489 N.W.2d 748 (1992),
or cites a case that ultimately relies on *Wolfe* for its statement of the standard.  *Wolfe*, in turn, expressly relies upon the
standard announced in *Jackson*.

to clearly established federal law.  The factual findings with respect to the evidence offered by the prosecutor appear to be reasonable.

Petitioner does not even attempt to find fault with the court's application of the *Jackson* standard or its factual findings.  Instead, he simply views the same evidence in a light that favors him and, therefore, reaches different conclusions.  It is Petitioner's argument, not the state court's determination, that is a patently unreasonable application of the *Jackson* standard.

The Michigan Court of Appeals identified the elements of felony murder:"(1) the killing of a human being; (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm would be the probable result; (3) while committing, attempting to commit, or assisting in the commission of an enumerated offense, including larceny." *Sterling*, 2008 WL 1810318 at *1 (citation omitted).  The court of appeals' analysis of the evidence against the *Jackson* standard supports the court's conclusion that there was sufficient evidence, circumstantial though it may be, to support the jury's verdict as to each of the elements of the charged offense.  Petitioner's sufficiency challenge has no merit.

II.     Witnesses that did not testify but should have
        (Habeas issues IIA, IIE, III, IV, and V)

Several of Petitioner's habeas issues are based on the fact that Detective Amy Hicok and witness Babbie Booker were not called to testify at his trial.  With respect to Detective Hicok, Petitioner contends his counsel's failure to call her constituted ineffective assistance.  With respect to Babbie Booker, Petitioner contends his counsel's failure to find her and call her constituted ineffective assistance and that the prosecutor's failure to provide sufficient assistance in locating Ms. Booker was misconduct that

rendered his trial unfair. Petitioner raised these issues for the first time in a motion for new trial following his conviction and sentence. The court conducted a hearing. The court heard testimony from Ms. Booker, Detective Hicok, Petitioner's trial counsel, and investigating officers.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). Matters of trial strategy, such as determinations regarding which witnesses to present and what questions to ask, are presumed correct and are generally not evaluated in hindsight or second-guessed upon habeas review. *McQueen v. Scroggy*, 99 F.3d 1302, 1311 (6th Cir. 1996). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. "When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on

one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

The standard for evaluating prosecutorial misconduct claim on habeas review is similarly deferential. *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) ("Claims of prosecutorial misconduct are reviewed deferentially on habeas review.") (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood

-16-

and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (internal quotation omitted).

For a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84 85 (1935).

A.      Detective Hicok

At the March 9, 2007 new trial motion hearing, Detective Hicok testified that on July 25, 1995, between 10:30 and 11:30 a.m., she was driving down Oakland Drive in Kalamazoo, Michigan. (New Trial Mot. Hr'g Tr. I, ECF No. 30, p. 80.) She saw a pedestrian, a black male, six feet tall or taller, wearing dark clothing and carrying a dark-colored backpack. (*Id*., p. 82-83.) He was walking away from the house where Robert was killed. (*Id*., p. 87.) She could not say whether or not the man she saw was Petitioner.

Michael Hills, Petitioner's trial counsel at both trials, compelled Detective Hicok's appearance at Petitioner's first trial by subpoena. (*Id.*, p. 85.) He had seen her written report during his investigation and preparation for trial; he hoped that she might have been shown a photo lineup. (New Trial Mot. Hr'g Tr. II, ECF No. 31, p. 243-244.) If that were the case, and she was not able to identify the pedestrian as Petitioner, it might support his defense. After speaking with her, however, he released her from the subpoena. (New Trial Mot. Hr'g Tr. I, ECF No. 30, p. 85-86.) He recalled that she had not been shown any photographs. (New Trial Mot. Hr'g Tr. II, ECF No. 31, p. 243-244.) He was concerned that putting Detective Hicok on the stand would simply confirm the description provided by the neighbor, Roettger, and could support a determination that the pedestrian was Petitioner leaving the scene. (*Id.*)

Detective Hicok, however, recalled that she was shown one photograph in August of 1995. (New Trial Mot. Hr'g Tr. I, ECF No. 30, p. 95-97.) She was not able to say, in August of 1995, whether the person in the photograph was the pedestrian or not. (*Id.*) She made that very clear to Attorney Hills when he interviewed her in anticipation of calling her as a witness before the August 2005 trial. (*Id.*, p. 101.)

In denying Petitioner's motion for new trial, the trial court concluded that Attorney Hills' decision to not call Detective Hicok was strategic and that it was not ineffective assistance. (*Id.*, p. 338-339.) The trial court also concluded that there was no prejudice to defendant from the decision because Detective Hicok's testimony may have helped the prosecution. (*Id.*, p. 337-339.) The Michigan Court of Appeals reached the same conclusions:

Defendant further argues that counsel was ineffective for failing to call Detective Amy Hicok as a witness. We disagree. Detective Hicok could not say whether defendant was the person she saw walking near the crime scene carrying a backpack-type bag, but her general description of the man she saw matched defendant and defendant did not have an alibi for the timeframe during which Detective Hicok saw the man. The trial court did not err in finding that counsel's decision not to call her as a witness was reasonable trial strategy. Her identification testimony was equivocal and there was the possibility that her testimony might actually help the prosecution.

*Sterling*, 2008 WL 1810318 at *6.

Petitioner's challenge to the state courts' determinations regarding Detective Hicok's testimony depends completely on his characterization of the testimony. He concludes that Detective Hicok's testimony constitutes "direct evidence that Petitioner was not the person involved in the homicide . . . ." (Pet. Attach. F, ECF No. 1-1, PageID.53.) Petitioner's characterization of Detective Hicok's testimony is simply unsupportable on this record. Detective Hicok could not say for sure whether Petitioner was or was not the pedestrian she saw on the morning of the murder.

Petitioner has not shown that the Michigan courts' determinations regarding counsel's strategic decision or the lack of resulting prejudice were contrary to *Strickland*. He has also failed to show that the courts' determinations regarding ineffective assistance are based on unreasonable findings of fact. Accordingly, Petitioner's challenge to his counsel's decision to not call Detective Hicok does not warrant habeas relief.

B.      Babbie Booker

Petitioner also contends his trial was unfair because he did not have the benefit of testimony from Babbie Booker. At the new trial hearing Ms. Booker testified that the black man she saw leave 829

-19-

Oakland nearly twelve years earlier was not Petitioner.  (New Trial Mot. Hr'g Tr. I, ECF No. 30, p. 109, 127.)  She testified that the man she saw had a darker complexion.  (*Id.*, p. 109.)

Babbie Booker provided several statements to police regarding what she saw at 829 Oakland.  (New Trial Mot. Hr'g Tr. I, ECF No. 30, p. 165-168, 179-181.) She made her first statement to Officer Pickerel on August 5, 1995, as he was processing her following her arrest a few days after the murder.  (*Id.*, p. 113, 115-117, 139-140.)  Her next statement was over the telephone to Detective Hatter on August 8, 1995.  (*Id.*, p. 120, 140-141, 165-168.)  Her third statement was made to Detective Alofs in a face-to-face interview on August 15, 1995.  (*Id.*, p. 114, 121, 142-144)  Those statements all occurred shortly after the murder.  When the cold case team picked up the investigation nearly ten years later, Ms. Booker was interviewed again. At that time, she was interviewed by Detective Handlogten. (*Id.*, p. 121-122, 179-181.)

According to the police reports, Ms. Booker reported first that she saw two black men leaving 829 Oakland at approximately 11:30 a.m. on July 25, 1995.  (*Id.*, p. 117-118.)  She has also reported that she saw a white man and a black man leaving the house and the black man had a handgun.  (*Id.*, p. 142-144.)  She has also reported that she saw three men leaving the house and that one of them, a white male, had a rifle.  (*Id.*, p. 147.)  She has provided different reasons for being near the home and different times of seeing the men leave 829 Oakland in different statements.  Ms. Booker also noted that she had been a heavy drinker in 1995 and continued that practice into 2005.  (*Id.*, p. 124-125, 141, 147-148.)

Having read the police reports, Attorney Hills was anxious to speak with Ms. Booker.  (New Trial Mot. Hr'g Tr. II, ECF No. 31, p. 251-253.)  He personally sought her out.  His investigator

had informed him it was unlikely she could be found.  (*Id.*, p. 262.)  Attorney Hills asked for assistance from the prosecutor to locate Ms. Booker. (*Id.*, p. 263-265, 278.)  He could have pushed the prosecutor to locate Ms. Booker by requesting a warrant or pursuing a due diligence hearing. (*Id.*, 265-266.)  He chose not to.  He was concerned that if the police located Ms. Booker they would procure yet another statement that might be inconsistent with her already inconsistent prior statements or, worse, identify the Petitioner as one of the men who walked out of 829 Oakland with a gun on July 25, 1995.  (*Id.*, p. 279-283.)

In light of Ms. Booker's appearance and the inconsistencies in her story, the trial court could not find that a reasonable attorney would have wanted her to testify at Petitioner's trials.  (*Id.*, p. 338.)  The Court also found that Petitioner was not prejudiced by the absence of Ms. Booker's testimony. (*Id.* p. 339.)

The Michigan Court of Appeals agreed with the trial court with regard to the reasonableness of counsel's decision to not further pursue Ms. Booker's testimony:

> Defendant argues that defense counsel was ineffective for failing to conduct an investigation regarding Babbie Booker.  Booker testified at defendant's posttrial hearing that she saw two men, one white and one black, exit O'Keefe's house around noon on the day of the offense.  She stated that one of them was carrying a gun and a black bag.  She stated that defendant was not the black man she saw.  However, the evidence presented at the hearing also showed that Booker gave several statements to the police that contained significant inconsistencies, including the number of persons she saw, their race, and what they were carrying.  Booker also had a criminal record and admittedly had a severe drinking problem in 1995, which lasted until at least 2006.

> Defense counsel obtained location information from the police before trial and unsuccessfully attempted to find Booker on his own.  When he tried to locate her before the first trial, his investigator was unsuccessful and informed him that chances of finding her were slim.  Counsel explained that he did not request more aggressive police efforts in locating Booker or force such efforts by requesting a due diligence hearing because he

-21-

wanted to locate her before the police did. He was concerned that if the police located her first, she would have given them another potentially inconsistent or unfavorable statement. Additionally, her general description of the black man she saw exiting O'Keefe's house, which she gave to the police in 1995, matched defendant's description. Counsel testified that he was also concerned about the police finding a witness that would turn out to be helpful to the prosecution. Therefore, he decided not to put more effort into finding Booker.

The trial court did not clearly err in finding that defense counsel had legitimate concerns regarding Booker's credibility and properly concluded that he made a strategic decision not to pursue her as a witness or request a due diligence hearing that might have led to more police involvement. This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. *People v. Matuszak*, 263 Mich.App. 42, 58, 687 N.W.2d 342 (2004). Even strategic choices made after an incomplete investigation are reasonable to the extent that reasonable professional judgments support the limitation on investigation. *Wiggins v. Smith*, 539 U.S. 510, 521-522, 528, 123 S.Ct. 2527, 2535, 2539, 156 L.Ed.2d 471, 485, 489 (2003).

Defendant also argues that the prosecution and the police failed to provide reasonable assistance to locate Booker, contrary to their duties under MCL 767.40a(5), which provides that "[t]he prosecuting attorney or investigative law enforcement agency shall provide to the defendant, or defense counsel, upon request, reasonable assistance, including investigative assistance, as may be necessary to locate and serve process upon a witness." The police provided defense counsel with an address for Booker. The law does not require a hearing to determine if the assistance provided was reasonable when there is no allegation that it was not. *People v. Cook* (On Remand), 266 Mich.App. 290, 295-296, 702 N.W.2d 613 (2005). Here, there was no request for a hearing. Thus, the question is whether defense counsel was ineffective for failing to request a due diligence hearing.

Defendant asserts that the trial court erred in finding that the prosecution exercised due diligence in attempting to locate Booker, improperly shifted the burden of proving prejudice from the lack of due diligence to defendant, and improperly made its own assessment of Booker's credibility. Because defense counsel advanced a strategic reason for not requesting a due diligence hearing, the trial court had to determine if counsel's decision was reasonable. The question whether the police assistance was reasonable was not addressed and did not need to be addressed by the trial court. Therefore, the trial court did not shift any burden to defendant. The court simply stated that had defendant desired more assistance, it would have been provided. The trial court's comments regarding Booker's credibility were made in the context of explaining that defense

counsel's decision not to pursue her, or request additional police efforts to locate her, was reasonable. As previously explained, the trial court did not clearly err in finding that counsel reasonably was concerned about Booker's credibility, and that he did not request a due diligence hearing as a matter of trial strategy.

*Sterling,* 2008 WL 1810318 at \*5-7.

The Michigan Court of Appeals' analysis is expressly consistent with, not contrary to, clearly established federal law regarding counsel's duty to investigate. The court of appeals cited *Wiggins v. Smith*, 539 U.S. 510 (2003). *Wiggins*, in turn, relied upon and quoted *Strickland*, the very bedrock of clearly established federal law on this issue:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

Moreover, the court of appeals reasonably applied *Strickland* when it concluded that Attorney Hills' decision to not further pursue the testimony of Babbie Booker, a decision based on credibility concerns and concerns that Ms. Booker's testimony might bolster the prosecution's case against Petitioner, was reasonable. *See Thurmond v. Carlton*, 489 F. App'x 834, 839-840 (6th Cir. 2012) (where defense counsel believed inconsistency in testimonies of prospective alibi witnesses rendered the testimony incredible, counsel's decision not to call either witness and not to further investigate alibi defense was reasonable); *Stadler v. Berghuis*, 483 F. App'x 173, 176-77 (6th Cir. 2012) (where defense counsel believed alibi testimony from family members was inherently incredible, counsel's decision to not call family

-23-

members or mount all-out investigation of alibi defense was reasonable).[4]    Because the ineffective

assistance claim fails at the first step, there is no need to evaluate prejudice. *Campbell*, 364 F.3d at 730.

        Petitioner's prosecutorial misconduct claim based on the prosecution's alleged failure to

exercise due diligence in locating Ms. Booker fares no better.    "[A] federal court may issue the writ to a

state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties

of the United States.'"  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)).    A

habeas petition must "state facts that point to a 'real possibility of constitutional error.'"  *Blackledge v.*

*Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING

HABEAS CORPUS CASES).    The federal courts have no power to intervene on the basis of a perceived error

of state law.  *Wilson*, 562 U.S. at 5; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*,

502 U.S. 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984).            Despite this limit on the

scope of habeas review, Petitioner's complaint regarding the prosecutor's lack of due diligence is premised

entirely on a state statute: MICH. COMP. LAWS § 767.40a(5) ("The prosecuting attorney or investigative

law enforcement agency shall provide to the defendant, or defense counsel, upon request, reasonable

assistance, including investigative assistance, as may be necessary to locate and serve process upon a

witness.").    Petitioner's challenge is not cognizable on habeas review.  *See Collier v. Lafler*, 419 F. App'x

---

[4]There is some question as to whether a state court's credibility determination with respect to the witness not called is entitled to a presumption of correctness when assessing the prejudicial effect of the decision to not call the witness.  *See Ramonez v. Berghuis*, 490 F. 3d 482, 491 (6th Cir. 2007) ("[W]eighing the prosecution's case against the proposed witness testimony is at the heart of the ultimate question of the *Strickland* prejudice prong, and thus it is a mixed question of law and fact not within the Seciton 2254(e)(1) presumption.").  The state court's determination with regard to counsel's belief regarding the credibility of a prospective witness, however, "is one of historical fact that we deem true unless [Petitioner] shows otherwise with 'clear and convincing evidence.'" *Thurmond*, 489 F. App'x at 840 (citing 28 U.S.C. § 2254(e)(1)).  Petitioner here has failed to present any evidence, much less clear and convincing evidence, that the state court was wrong when it determined Attorney Hills was reasonably concerned about Ms. Booker's credibility.

555, 560 (6th Cir. 2011) ("[W]hether the prosecutor exercised 'due diligence' [in locating a *res gestae* witness] is outside the scope of our AEDPA review."); *see also Buchanan v. Palmer*, No. 1:11-cv-1359, 2014 WL 7382950 (W.D. Mich. Dec. 29, 2014) (holding that violation of MICH. COMP. LAWS § 767.40a, regarding identification of *res gestae* witnesses and the provision of reasonable assistance in locating and serving process upon them, is a state law claim not cognizable on habeas review).

III.   Witnesses that testified but should not have
       (Habeas issues VI, VII, VIII, IX, and XI)

Petitioner also complains that witnesses testified when they should not have been permitted to testify.

A.   Dr. Harvey Wilkes

First, Petitioner contends that his Sixth Amendment Confrontation Clause rights were violated when the court permitted Dr. Harvey Wilkes to testify, or effectively testify, by the admission into evidence of Dr. Wilkes' autopsy report. Dr. Wilkes died before any of the Petitioner's court proceedings; so he was never cross-examined with respect to the content of the autopsy report.

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The right to confront applies to witnesses: "those who 'bear testimony.'" *Crawford v. Washington*, 541 U.S. 36, 51 (2004). Thus, not every out-of-court statement introduced at trial will implicate the protections of the Confrontation Clause. "The constitutional text . . . reflects an especially acute concern with a specific type of out-of-court statement[s:] . . . 'testimonial' statements" *Id.*

-25-

The first question, therefore, is whether Dr. Wilkes' autopsy report is the sort of "testimonial statement" covered by the Confrontation Clause. If the report is testimonial, the report cannot be considered at trial unless Dr. Wilkes was unavailable to testify at trial **and** Petitioner had a prior opportunity to cross-examine Dr. Wilkes. *Id.* at 59 ("Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.") (footnote omitted). If the report is not testimonial, admission of the report cannot violate the Confrontation Clause.

The Michigan trial court concluded the autopsy report was not testimonial. (Op. and Order, ECF No. 35, p. 5-6.)[5] The trial court specifically referenced *Crawford* in its opinion. (*Id.*) Petitioner has not identified any clearly established federal law to which the trial court's decision is contrary. The Sixth Circuit has concluded that there is no Supreme Court precedent establishing that an autopsy report is testimonial. *Mitchell v. Kelly*, 520 F. App'x 329, 331 (6th Cir. 2013) ("[T]he decision of the Ohio Court of Appeals was not an unreasonable application of *Crawford* given the lack of Supreme Court precedent establishing that an autopsy report is testimonial."); *see also Cato v. Prelesnik*, No. 1:08-cv-1146, 2012 WL 2952183 at *3 (W.D. Mich. July 18, 2012) ("[W]hen his conviction became final in

---

[5]The trial court relied on *People v. Raby*, No. 278617, 2009 WL 839109 (Mich. Ct. App. March 31, 2009) (herein "*Raby I*"). The *Raby I* court relied on *Crawford* to conclude that autopsy reports were not testimonial. *Id.* at *1-3. The *Raby I* opinion was vacated by the Michigan Supreme Court and the matter was remanded to the Michigan Court of Appeals for consideration in light of the intervening Supreme Court decision in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). *People v. Raby*, 775 N.W.2d 144 (Mich. 2009). In *Melendez-Diaz*, the Supreme Court concluded that "certificates of analysis," notarized affidavits from laboratory analysts identifying particular bagged substances as cocaine, were testimonial. *Melendez-Diaz*, 557 U.S. at 311. On remand, the Michigan Court of Appeals concluded again that autopsy reports were non-testimonial. *People v. Raby*, No. 278617, 2010 WL 1507967 (Mich. Ct. App. Apr. 15, 2010) (herein "*Raby II*"). The Michigan Supreme Court denied the defendant's application for leave to appeal the *Raby II* decision. *People v. Raby*, 783 N.W. 2d 386 (Mich. 2010). It is not clear whether *Raby II's* conclusion that an autopsy report is not testimonial is still the standard in Michigan today. *See People v. Lewis*, 806 N.W.2d 295 (Mich. 2011) ("[I]n lieu of granting leave to appeal, we AFFIRM the result reached by the Court of Appeals, but VACATE that part of the Court of Appeals opinion holding that the autopsy report was not testimonial . . . .")

-26-

2005, no clearly established Supreme Court precedent established the right he seeks to vindicate. Cato cites to *Crawford v. Washington*, but though it was decided in 2004, *Crawford* did not clearly establish that autopsy results are testimonial in nature. Indeed, as the magistrate judge notes, even under *Melendez–Diaz* this conclusion is uncertain."); *Hensley v. Roden*, 755 F.3d 724, 735 (1st Cir. 2014) (concluding that neither *Crawford* nor *Melendez-Diaz* clearly establish that autopsy reports are testimonial); *Vega v. Walsh* 669 F.3d 123, 128 (2d Cir. 2012) (concluding that even if it were true that autopsy reports were testimonial under *Melendez-Diaz* or *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), they were not clearly established to be so under *Crawford* and *Crawford* was the appropriate measure when the conviction became final); *McNeiece v. Lattimore*, 501 F. App'x 634, 636 (9th Cir. 2012) (same); *but see United States v. Ignasiak*, 667 F.3d 1217, 1229-233 (11th Cir. 2012) (concluding that under *Crawford*, *Melendez-Diaz*, and *Bullcoming* autopsy reports from Florida's Medical Examiners Commission, part of the Department of Law Enforcement, were testimonial).[6]

Petitioner has failed to show that the state court's conclusion regarding the non-testimonial nature of autopsy reports is contrary to or inconsistent with clearly established federal law. Accordingly, his Confrontation Clause challenge to the introduction of Dr. Wilkes' autopsy report collapses at the first step.

Petitioner's further contention that his counsel rendered ineffective assistance when he failed to challenge the admission of the autopsy report into evidence on Confrontation Clause grounds also fails. As the trial court recognized, (Op. and Order, ECF No. 35, p. 6), counsel's failure to make a meritless

---

[6]The 11th Circuit Court's conclusion in *Ignasiak* does not conclude that *Crawford*, *Melendez-Diaz*, and *Bullcoming* "clearly establish" that autopsy reports are testimonial. *Ignasiak* is a federal criminal case, not a habeas case; thus, the court was not applying the standards of § 2254.

objection or motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

        B.      Dr. Joyce De Jong

In Dr. Wilkes' absence, forensic pathologist Dr. Joyce DeJong testified regarding the autopsy of Robert O'Keefe. Petitioner argues that Dr. DeJong's testimony also violated the Confrontation Clause because it relied upon Dr. Wilkes' report. To the extent Petitioner's challenge to the testimony of Dr. DeJong is premised on Confrontation Clause issues with the introduction of Dr. Wilkes' report, if fails for the reasons stated above.

To the extent Petitioner's challenge is based on the proper scope of expert testimony, that is an issue of state law. The state court concluded that Dr. De Jong's testimony, even that portion of her testimony that relied on the report of Dr. Wilkes, was admissible under the Michigan Rules of Evidence. (Op. and Order, ECF No. 35, p. 6). That determination is binding on this Court. *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'") (quoting *Bradshaw*, 546 U.S. at 76).

Any objection to the admission of Dr. De Jong's testimony would have been meritless. Accordingly, the assistance of Petitioner's trial counsel would not be rendered ineffective for failing to raise the issue.

        C.      James Rushmore

On the fifth day of Petitioner's second trial, the prosecution offered the testimony of James Rushmore, one of Petitioner's cellmates at the Kalamazoo County Jail, by way of a videorecording of Mr. Rushmore's prior testimony at the preliminary examination and at the first trial. Petitioner objects that the introduction of Mr. Rushmore's testimony in this fashion violated his rights under the Confrontation Clause.

Before the trial court permitted the admission of Mr. Rushmore's testimony, it heard testimony from Detective Lance Handlogten regarding the efforts made to locate Mr. Rushmore and serve him with a subpoena. Detective Handlogten testified that the Kalamazoo prosecutor's office generated a subpoena on February 28, 2006, to compel Mr. Rushmore's testimony at Petitioner's trial which was scheduled to begin the first week of April. (Trial II Tr. V, ECF No. 25, p. 722.) The subpoena was sent to Emily Whitehead, a parole and probation officer for Kalamazoo County. (*Id*.) The prosecutor had achieved service using this method for the preliminary examination and the first trial. (*Id*., p. 723, 733.) Ms. Whitehead advised the prosecutor's office that Mr. Rushmore was a parole absconder. (*Id*., p. 722.)

Detective Handlogten investigated Mr. Rushmore using various databases and checked the status of Mr. Rushmore's parole absconder warrant. (*Id*., p. 723-724.) He visited the home of Mr. Rushmore's father. (*Id*., p. 724.) He contacted Mr. Rushmore's parole officer. (Id.) He created a notice in the computer records database. (*Id*., p. 724-72.5) He contacted the Michigan Department of Corrections parole absconder unit. (*Id*., p. 726, 729.) He visited addresses for Mr. Rushmore, and visited or contacted Mr. Rushmore's family and former girlfriends. (*Id*., p. 726-729.)

Detective Handlogten was not able to locate Mr. Rushmore before trial. After the first week of trial, he received a call from Mr. Rushmore's father indicating that Mr. Rushmore had attempted

to call.  (*Id*., p. 729-730.)  Further investigation revealed that Mr. Rushmore had attempted to make a collect call from some type of correctional facility in Missouri.  (*Id*., p. 732, 742-743.)  The call was captured on the answering machine; however, because no one was there to accept the collect call, it was terminated. (*Id*.)  Moreover, the answering machine tape had been erased.  (*Id*.)  Detective Handlogten testified that he had no way to determine what state or local facility the call might have come from. (*Id*., 742-743.)  There was no activity regarding Mr. Rushmore on the Law Enforcement Information Network (LEIN).  (*Id*., p. 731-732.)

The trial court concluded that the prosecutor had made a good faith effort to locate and serve Mr. Rushmore but that he was unavailable.  (*Id*., p. 744-746.)

Petitioner contends that the introduction of Mr. Rushmore's testimony from the preliminary examination and first trial violated his Confrontation Clause rights because the prosecutor had failed to establish that Mr. Rushmore was unavailable.[7]   The clearly established federal law with regard to Confrontation Clause "unavailability" was set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980):

> The basic litmus of Sixth Amendment unavailability is established: "[A] witness is not 'unavailable' for purposes of the . . . exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v. Page*, 390 U.S., at 724–725, 88 S.Ct., at 1322 (emphasis added). *Accord, Mancusi v. Stubbs, supra*; *California v. Green*, 399 U.S., at 161–162, 165, 167, n. 16, 90 S.Ct., at 1936–1937, 1938–1939, n. 16; *Berger v. California*, 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969).

---

[7]See Section III. A., *infra*.  With respect to Dr. Wilkes, it was undisputed he was unavailable and also undisputed that there had been no prior opportunity to cross-examine.  Therefore, for Dr. Wilkes, resolution of the Confrontation Clause issue depended upon the testimonial character of the out-of-court statement.  With respect to Mr. Rushmore, it is undisputed that the statements are testimonial and also undisputed that Petitioner enjoyed a prior opportunity to cross-examine.

Although it might be said that the Court's prior cases provide no further refinement of this statement of the rule, certain general propositions safely emerge. The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation. "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *California v. Green*, 399 U.S., at 189, n. 22, 90 S.Ct., at 1951 (concurring opinion, citing *Barber v. Page, supra*). The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate.

*Id.* at 74-75.[8]  In the context of review under the AEDPA, the Supreme Court has cautioned against

disturbing a state court's reasonable conclusion regarding unavailability:

[W]hen a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, see 448 U.S., at 75, 100 S.Ct. 2531, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising. And, more to the point, the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken. Under AEDPA, if the state-court decision was reasonable, it cannot be disturbed.

*Hardy v. Cross*, 132 S. Ct. 490, 495 (2011).

In Petitioner's argument, he reviews the same facts considered by the trial court and draws

the conclusion that the prosecutor did not make a good faith effort to locate and serve Mr. Rushmore.

(Pet. Attach. F, ECF No. 1-1, PageID.64-67.)  Petitioner fails, however, to demonstrate that the trial

court's determination is contrary to, or inconsistent with, clearly established federal law. Petitioner similarly

---

[8]Although *Crawford*, 541 U.S. at 36, eliminated the *Roberts* "indicia of reliability" exception, it left intact the stated requirement of unavailability. *Crawford*, 541 U.S. at 68 ("[T]he Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."); *see also Hardy v.* Cross, 132 S. Ct. 490, 494-495 (2011) (applying *Roberts* unavailability standard); *Hamilton v. Morgan*, 474 F.3d 854, 858-59 (6th Cir. 2007) (applying the unavailability standard of *Roberts* and acknowledging that *Crawford* overruled *Roberts* on other grounds).

fails to show that the trial court's determination is the result of an unreasonable determination of the facts. Instead, Petitioner simply suggests that the prosecution could have taken additional steps to find Mr. Rushmore. That is not the standard. On the record before this Court, there is no indication that the trial court's determination of the prosecutor's good faith is unreasonable. Accordingly, Petitioner's challenge to Mr. Rushmore's testimony has no merit.

Petitioner goes on to argue that because Mr. Rushmore was found to be in a Missouri Correctional Facility yet was not produced at trial, the court should have given the "missing witness" instruction to the jury: "you may infer that this witness testimony could have been unfavorable to the prosecution case." (Pet. Attach. F, ECF No. 1-1, PageID.68-69.) The premise of Petitioner's argument, that Mr. Rushmore was found to be in a Missouri Correctional Facility, is not supported by the record.[9] Moreover, the propriety of giving the instruction is purely a matter of state law. The state court concluded that the instruction was not appropriate here. (Op. and Order, ECF No. 35, p. 8). That decision is binding on this Court.[10] Under these circumstances, Petitioner's further contention that his counsel is ineffective for failing to request the instruction has no merit.

Moreover, to the extent Petitioner means to challenge his trial as fundamentally unfair in the absence of the instruction, "no Supreme Court case has clearly established that a due process violation

---

[9]Indeed, if the record demonstrated that Mr. Rushmore were incarcerated in a Missouri Correctional Facility, he might not be considered "unavailable." *See Barber v. Page*, 390 U.S. 719, 724-725 (1968).

[10]The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright*, 464 U.S. at 84; *Stumpf*, 722 F.3d at 746 n.6) (quoting *Bradshaw*, 546 U.S. at 76) ("'[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'").

results from the failure to give [a missing witness] instruction." *Stadler v. Curtin*, 682 F. Supp. 2d 807, 821-822 (E.D. Mich. 2010), *aff'd Stadler v. Berghuis*, 483 F. App'x 173 (6th Cir. 2012).

IV.     Other evidence improperly admitted
        (Habeas issues II.B., II.C., and II.D.)

        A.      Bad acts

Petitioner complains that his counsel was ineffective for failing to object to the admission

of "other acts" evidence in the form of testimony regarding the bank robbery perpetrated by Petitioner and

Robert O'Keefe.[11]  Petitioner's trial counsel testified that he was purposeful when he did not object to

testimony regarding the bank robbery.  (New Trial Mot. Hr'g Tr. II, ECF No. 31, p. 246-249.)  The

evidence was important to help explain Petitioner's unusual behavior on three occasions.

        First, testimony regarding the robbery helped explain Petitioner's words and actions at 829

Oakland on July 25, 1995, after the police arrived. (Trial II Tr. II, ECF No. 22, p. 261.) He spoke with

Christina Laing. (*Id*.) He asked her about O'Keefe's blue day planner. (*Id*.) After the police had gone,

he returned to the house, entered it, and attempted to enter O'Keefe's bedroom, claiming he was seeking

the blue planner. (*Id*., p. 262-264.) Petitioner explained to the jury that he wanted the blue day planner

because he believed O'Keefe might have written something in the book about robbing the bank.[12] (Trial

II Tr. VI, ECF No. 26, p. 841-842.)

        Second, testimony regarding the robbery was important to explain Petitioner's efforts to

hide evidence.  The night of the murder Petitioner was questioned by Detective Hatter. (Trial II, Tr. VI,

ECF No. 26, p. 871-872.) When that interview was complete, Detective Hatter and Petitioner were going

---

[11]Testimony regarding the bank robbery was elicited from Tricia Emme, the victim's sister (Trial II Tr. IV, ECF No. 24, p. 618-620, 640); Detective Lance Handlogten (Trial II Tr. V, ECF No. 25, p. 757-758); Petitioner; and his wife.

[12]Detective Handlogten testified that there was nothing in the blue planner regarding the bank robbery. (Trial II Tr. V, ECF No. 25, p. 767-768.)

-34-

to the apartment shared by Petitioner and his girlfriend, Laura Schmidt, to search the premises. (*Id.*; Trial II Tr. IV, ECF No. 24, p. 592-593.)  After the interview, but before they traveled to the apartment, Petitioner called his girlfriend, Laura Schmidt, and asked her to take his briefcase and put it in the trunk of her car. (Trial II, Tr. VI, ECF No. 26, p. 871-872; Trial II Tr. IV, ECF No. 24, p. 593-595.)  In closing argument, the prosecutor urged the jurors to infer that the briefcase contained evidence of the murder, perhaps the money and the gun. (Trial II Tr. VII, ECF No. 27, p. 927.)  Petitioner testified he asked Ms. Schmidt to hide the briefcase because it contained evidence of the bank robbery.  (Trial II, Tr. VI, ECF No. 26, p. 871-872.)

Finally, in a recorded telephone conversation with his wife, a conversation that occurred while he was in jail awaiting trial for O'Keefe's murder, Petitioner stated, among other seemingly incriminating statements: "well, as a man I have to accept responsibility for my actions past and present whether I had anything to do with this or not--And I didn't.–I have to accept responsibility for the situation where I had an opportunity to tell and accept responsibility a long time ago instead of keeping my mouth shut; and, you know, here I am." (Trial II Tr. VI, ECF No. 26, p. 826.)  Petitioner's wife testified they were talking about the bank robbery, not the murder.  (*Id.*, p. 830-831.)  Petitioner echoed that testimony. (*Id.*, p. 892.)

The trial court relied on these purposes of the testimony, as well as its impact on the credibility of Tricia Emme, in concluding that there were several strategic reasons for Petitioner's counsel to permit the admission of evidence regarding the bank robbery.  (New Trial Mot. Hr'g Tr. II, ECF No. 31, p. 332-333.)    The court of appeals affirmed the trial court's conclusion:

Defendant says that defense counsel was ineffective for failing to challenge the prosecutor's use of other bad acts evidence, specifically defendant's involvement in a bank robbery. Defense counsel explained that he used this evidence to explain why defendant was at the murder scene looking for O'Keefe's day planner and why he asked Schmidt to move his briefcase before the police searched his home, conduct that a jury might interpret as evidence of a cover-up or consciousness of guilt. Defense counsel also used the evidence to attack Emme's credibility, whose testimony was generally damaging to defendant. Although she participated in the bank robbery, she was not charged in the matter after she helped the FBI build its case against defendant. The trial court did not clearly err in finding that the evidence was helpful to defendant's case and that defense counsel's decision not to object to its admission was trial strategy.

*Sterling*, 2008 WL 1810318 at *4 (footnote omitted).

Petitioner's challenge is a simple one: he claims that failing to object to the bank robbery evidence "cannot be justified as trial strategy . . . ." (Pet. Attach. F, ECF No. 1-1, PageID.45.) That statement is insufficient to overcome the court of appeals' analysis. Petitioner does not attempt to demonstrate that the state court's determination is contrary to, or inconsistent with, clearly established federal law. Moreover, the factual findings that form the basis for the determination are patently reasonable. Absent reference to the bank robbery, Petitioner had nothing to counter the prosecution's interpretation of his strange request for O'Keefe's day planner, his instruction to Ms. Schmidt to conceal his briefcase, or his damning statements to his wife. Accordingly, Petitioner's claim that his counsel rendered ineffective assistance when he failed to object to the bank robbery evidence is without merit.

Petitioner further contends the introduction of the bank robbery evidence denied him a fair trial, implying that it violated his right to due process. The admissibility of the evidence under the Michigan Rules of Evidence is purely an issue of state law. It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 68. The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright*

*v. Goode*, 464 U.S. 78, 84 (1983).  The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'"  *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).  Thus, the Michigan Court of Appeals determinations that the bank robbery evidence was admissible under the Michigan Rules of Evidence, conclusively resolves that state law issues.

That leaves Petitioner to the very limited review afforded to state-court evidentiary rulings under the Due Process Clause.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552.  Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not met this difficult standard.  There is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle*, the Supreme Court declined to hold that the admission

of prior acts evidence violated due process. *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n. 5. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has also found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512. Petitioner's habeas challenge to the admissibility of the bank robbery evidence is without merit.

### B. Autopsy photos

Petitioner contends that three photographs taken by the medical examiner should not have been admitted into evidence because they were unduly prejudicial. The Michigan Court of Appeals rejected the claim:

> Also, defendant says that counsel was ineffective for failing to object to the admission of autopsy photographs. He asserts that the photographs were unnecessary, because he did not dispute the cause of O'Keefe's death. However, the photographs were relevant to explain the pathologist's testimony that powder stippling around the wounds and a grazing wound on O'Keefe's hand revealed that O'Keefe's hand was near his face when he was shot in the cheek at close range. Although defendant did not dispute the cause of O'Keefe's death, the prosecutor may permissibly introduce all relevant evidence, including evidence that is probative of a matter that the defendant does not dispute. *People v. Mills*, 450 Mich. 61, 71, 537 N.W.2d 909 [(]1995), *mod* 450 Mich. 1212, 539 N.W.2d 504 (1995). The prosecution bears the burden of proving all elements of the crime beyond a reasonable doubt, regardless of whether a defendant disputes or stipulates to an element. *Id.* at 69-70, 537 N.W.2d 909. Accordingly, the photographs were admissible, and defense counsel did not err in failing to object.

Defendant also avers that the photographs were prejudicial because their gruesome nature only served to inflame the jury. However, the probative value of the photographs outweighed the potential for prejudice because the powder stippling indicated a close range shot, which showed intent to kill. Gruesome photographs need not be excluded unless their probative value is substantially outweighed by the danger of unfair prejudice, even if they tend to arouse jurors' passions. *Id.* at 75-77, 537 N.W.2d 909. Although some of the jurors might have found the photographs disturbing, they are not so gruesome that they would have caused the jurors to abandoned [sic] their duty to follow their instructions to consider the evidence as a whole. Accordingly, defense counsel was not ineffective for not objecting to their admission.

*Sterling*, 2008 WL 1810318 at *4-5. To the extent the court of appeals opinion resolves the issue as a matter of state evidentiary law, that determination is binding on this Court. *Wainwright*, 464 U.S. at 84.

With respect to constitutional propriety, Petitioner has failed to demonstrate that the court of appeals' resolution is contrary to, or an unreasonable application of, clearly established federal law. Indeed, the Sixth Circuit repeatedly has held that the introduction of gruesome photographs of a victim's corpse in a murder case does not offend the Constitution when there is some legitimate evidentiary purpose for demonstrating the nature of the injuries. *See, e.g., Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) ("The [state] court found, however, that the photographs were properly admitted as they demonstrated that Biros beat Engstrom rather severely and meticulously dissected her body with two different knives."); *Frazier v. Huffman*, 343 F.3d 780, 789 (6th Cir. 2003) ("The Ohio Supreme Court directly addressed this evidentiary issue, concluding that the multiple photographs 'were introduced during the coroner's testimony to illustrate the testimony,' that '[e]ach photograph presents a different perspective of the victim,' and that the photographs 'were used to illustrate' the nature of the encounter that immediately preceded Skiba's death.") (citation omitted); *Cooey v. Coyle*, 289 F.3d 882, 893 (6th Cir. 2002) (observing that

"although the photographs were gruesome, they were highly probative"). The photographs were relevant to illustrating trial testimony regarding the victim's injuries. Moreover, the photographs in this case were less inflammatory than in *Biros*, where the Sixth Circuit upheld the admission of photographs depicting a victim's severed head, severed breast, and severed body parts placed near the victim's torso. *See Biros*, 422 F.2d at 391. Accordingly, Petitioner cannot establish a due process violation arising from admission of the photographs.

Because neither state law nor the constitution would justify exclusion of the autopsy photos, Petitioner's counsel was not ineffective for failing to object to their admission.

C.    Petitioner's photo

At the time of trial, more than ten years after the murder, Petitioner's head was shaved. The prosecutor showed several witnesses a photo of Petitioner with hair. The photo was designated as Exhibit 5. Petitioner testified that Exhibit 5 was taken while he was incarcerated, some time after O'Keefe's death. (Trial II Tr. VI, ECF No. 26, p. 874-875.) He claimed that he kept his head generally shaved in the July 1995 time frame; he would not let it grow for more than two or three days. (*Id*., p. 873.) Petitioner's hair length was an issue, because the neighbor, Roettger testified that when he saw Petitioner at 829 Oakland the afternoon of the murder, "[h]e looked similar to the gentleman that was there in the morning earlier, but his hair looked like it was shorter . . . ." (Trial II Tr. II, ECF No. 22, p. 387.) Tricia Emme testified that Petitioner told her he had gotten a haircut on July 25. (Trial Tr. IV, ECF No. 24, p. 622.)

Petitioner noted that the jury in the first trial was instructed that the photograph of Petitioner was not a photograph of him at the time of O'Keefe's murder. (Pet. Attach. F, ECF No. 1-1, PageID.46.)

That instruction was not offered at the second trial. Petitioner suggests that the absence of that instruction rendered the second trial unfair, but he does not clearly express how. He implies that somehow without the instruction the jury was misled as to Petitioner's appearance at the time of the homicide. He also contends his counsel's failure to object to admission of the photo constituted ineffective assistance.

> The court of appeals rejected Petitioner's claim:
>
> > Defendant contends that his trial counsel was ineffective for failing to object to the prosecutor's use of a photograph to depict the length of defendant's hair at the time of the offense. The parties agree that the photograph was taken after defendant's arrest for bank robbery, which defendant mentioned in his testimony at trial. Although the date the photograph was taken was not revealed to the jury, neither did the prosecutor suggest that the photograph was taken in 1995.
> >
> > Additionally, we fail to see how defendant was prejudiced. The witnesses who were shown the photograph stated that defendant's hair was longer in 1995 than it was at the time of trial, but shorter than it appeared in the picture. Defendant testified that the photograph did not accurately depict his hairstyle in 1995 and he introduced photographs of his own from the fall and winter of 1994, and the spring of 1995, showing his hairstyle at the time. Accordingly, failure to object to the photograph did not constitute ineffective assistance.

*Sterling*, 2008 WL 1810318 at *4. Petitioner does not identify any clearly established federal law to which the court of appeals determination might be contrary. The decision appears to be entirely consistent with *Strickland* with regard to the determinative analysis of prejudice. The state court's factual determinations with regard to the testimony are reasonable on this record. The prosecutor did not argue, and no witness testified, that Exhibit 5 was a picture of Petitioner as he appeared during July of 1995. It appeared to be unanimously acknowledged that Petitioner's hair was a different length in July of 1995 than it was when the photo was taken. Petitioner has failed to make the necessary showing that the court of appeals' prejudice analysis fell short under § 2254(d) so as to warrant habeas relief.

V.  Prosecutorial misconduct
    (Habeas issue IX)

Petitioner contends his trial was rendered unfair by several instances of prosecutorial misconduct. First and foremost, Petitioner argues that the prosecutor failed to meet his obligation to produce James Rushmore. That issue is discussed above, *see* III.C. *infra*, and cannot support habeas relief. Petitioner identifies two other instances of misconduct during the prosecutor's closing argument: first, the prosecutor improperly vouched for the credibility of James Rushmore; and second, the prosecutor argued facts not in evidence when he suggested Petitioner's briefcase contained the money and gun taken from Robert O'Keefe's car.

Misconduct by a prosecutor can rise to the level of a due process violation. *Lundy v. Campbell*, 888 F.2d 467, 474 (6th Cir. 1989). However, before habeas corpus relief becomes available, the misconduct must be so egregious as to deny petitioner a fundamentally fair trial. *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993). The habeas court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). In addition, the court may view any misconduct in light of the strength of the competent proofs tending to establish guilt. *See Angel v. Overburg*, 682 F.2d 605, 608 (6th Cir. 1982) (en banc). "When a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *Serra*, 4 F.3d at 1355 (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). As stated above with respect to Babbie

-42-

Booker's testimony, "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender*, 376 F.3d at 528 (citing *Bowling*, 344 F.3d at 512).

### A.    Vouching

Petitioner contends that the prosecutor, in making his argument regarding the testimony of James Rushmore, engaged in improper "vouching" for his witness.  The Sixth Circuit has generally recognized two types of objectionable vouching.  *See Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)); *but see  Wogenstahl v. Mitchell*, 668 F.3d 307, 328-29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard).[13]  The first type impermissibly places the government's prestige behind the witness to bolster the witness' credibility.  *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992).  In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt.  *See Francis*, 170 F.3d at 551; *United*

---

[13]Notwithstanding the Sixth Circuit's continuing application of its own precedent on vouching, *see Wogenstahl*, 668 F.3d at 328-29 (citing *Johnson v. Bell*, 525 F.2d 466, 482 (6th Cir. 2008)), the Supreme Court has not directly held that vouching amounts to prosecutorial misconduct.  Given the Supreme Court's recent admonitions to the courts regarding the limits of clearly established general principles, it is doubtful that vouching has been clearly established by the Supreme Court as a due process violation.  *See, e.g., Lopez v. Smith*, 135 S. Ct. 1, 3 (2014) (holding, with respect to a claim of self-representation, that "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'") (quoting *Marshal v. Rodgers*, 133 S. Ct. 1446, 1450 (2013); *White v. Woodall,* 134 S. Ct. 1697, 1703 (2014) (same, respecting a claim regarding the privilege against self-incrimination); *Parker*, 132 S. Ct. at 2155 ("The highly generalized standard for evaluating claims of prosecutorial misconduct set forth in *Darden* bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit here.").

*States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965);  *Henderson v. United States*, 218 F.2d 14, 19

(6th Cir. 1955).

Petitioner specifically objects to the following argument:

When you discuss Rushmore--Rushmore's testimony, when you evaluate his credibility, please consider the numerous details he was able to provide--details corroborated by other witnesses.  Details like Sterling wanted to buy a bar.  Sterling wanted to buy the Warehouse bar in particular.  He had associates--Rob and later on Rick Welch.  He--meaning Sterling--needed money to buy the bar.  Rushmore knew that a gun was involved and that someone had been shot.  He knew about a bank robbery, and he knew about motorcycle communication headsets that the defendant had.

Rushmore had a lot of detail.  Do you really think his account of their conversation was manufactured, that the conversation never occurred?  How would Rushmore have been able to relate so much accurate historical information unless he actually had the conversation?

Why would he come in and lie?  What motivation would he have?  If he was going to fabricate something, why not make it really good like Sterling confessed killing Rob O'Keefe?  Rushmore is getting nothing from his testimony.  In fact, he would rather have avoided the police altogether.  He didn't go to them; they came to him in their search for fellow cellmates from the past.  The bottom line is this: all of the circumstances surrounding Rushmore's statement suggest that he is credible.

(Trial II Tr. VII, ECF No. 27, p. 929-930.)

The trial court rejected Petitioner's claim:

Next the Defendant argued that the Prosecutor improperly vouched for the credibility of Rushmore during his closing arguments when he asked, "Why would he come in and lie? . . . [A]ll the circumstances surrounding Rushmore's statement suggest that he is credible." (Trial Transcript p. 930) As explained in *People v. Bahoda*, 448 Mich 261, 282 (2005):

"[p]rosecutors are accorded great latitude regarding their arguments and conduct." *People v. Rohn*, 98 Mich. App. 593, 596, 296 N.W.2d 315 (1980), citing *People v. Duncan*, 402 Mich. 1, 260 N.W.2d 58 (1977).  They are "free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the case." *People v. Gonzalez*, 178 Mich. App. 526, 535,

-44-

444 N.W.2d 228 (1989).  *See also People v. Bigge*, 297 Mich. 58, 68, 297 N.W.2d 70 (1941).

The Prosecutor was simply drawing a reasonable inference from the evidence.  There was no misconduct.

(Op. and Order, ECF No. 35, p. 9.)  The court recognized the impropriety of vouching.  The court then concluded that the prosecutor was not vouching; rather, he was drawing the jury's attention to the evidence introduced and inviting the jury to draw inferences from the evidence regarding Rushmore's credibility.  In *United States v. Parker*, 49 F. App'x 558 (6th Cir. 2002), the Sixth Circuit recognized the propriety of such an argument:

> Our review of the challenged remarks in this case fails to reveal any improper indications of personal belief by the prosecutor.  The prosecutor asked the jury to draw reasonable inferences from the evidence, encouraging the jurors to look at the evidence presented while considering the motivations behind the testimony.  Under *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir.1996), counsel must be given leeway to argue reasonable inferences from the evidence. In "submitting" that the various government witnesses had "no reason to lie," the prosecutor directed the jurors back to the "believable" testimony but never asserted as a matter of personal conviction that the witnesses were honest, did not rely on knowledge outside of the facts presented at trial, and did not argue that there was an outside arrangement with the government, such as a plea agreement, requiring honesty. [citations omitted] Rather, the prosecutor in this case merely referred to the evidence and offered an explanation for the witnesses' possible motivation to lie or to tell the truth in a situation in which credibility was key to the jury's determination of guilt or innocence.

*Parker*, 49 F. App'x at 563; *see also Cockream v. Jones*, 382 F. App'x 474, 485 (6th Cir. 2010) ("Asking the jury to infer credibility from facts already in evidence . . . does not cross that impropriety threshold."); *Miller v. Burt*, No. 15-2269, 2016 WL 1169096 at *5 (6th Cir. Mar. 25, 2016) ("[T]he prosecutor permissibly argued that based on the evidence, the jury should consider which witnesses had a motive to lie and asked the jury to draw reasonable inferences from the evidence.').

Petitioner has failed to demonstrate that the trial court's resolution of his vouching claim is contrary to or inconsistent with clearly established federal law. Further, he has failed to show that the state court's resolution of the issue is based on an unreasonable determination of the facts. Accordingly, Petitioner has failed to support the claim that his trial was rendered unfair by the prosecutor's argument regarding Rushmore's credibility.

        B.     Arguing facts not in evidence

Petitioner contends the prosecutor also crossed the line in his closing argument when he stated Petitioner's briefcase contained the missing cash and gun:

> Fifth area, defendant's actions or statements. Consider this evidence: Sterling went to the police station to be interviewed the night of the murder. While there he consented to a search of his apartment on Big Bend Street and of his car parked by Rick Welch's on South Park. He rode to the apartment separately from the detectives.
>
> He called Laura Schmidt sometime during the evening of the murder after she was already in bed, and he said that the police might be stopping by. He asked her to take his briefcase and put it in the trunk of her car. Ladies and gentlemen, that is huge. Why would he make such a strange request?
>
> Why? Because he had evidence in it. And I don't mean evidence of the bank robbery-the newspaper clipping and the frequency manual as he claimed yesterday. I mean evidence of the murder of Robert O'K.eefe: thousands of dollars and a .44 caliber revolver.
>
> He'd already gotten rid of Rob's briefcase after leaving the MRC interview, but he wasn't about to throw away the money or the gun. Those things were in his own briefcase.
>
> He probably thought it would be safe there for a while, but things had digressed rapidly. He had gone from the scene in the afternoon straight to Rich Welch's from there on to Tricia Emme's over to the hospital and then too [sic] the police headquarters where the police interviewed him, leaving from there to go directly to his home on Big Bend Street where they would search and find.

(Trial II Tr. VII, ECF No. 27, p. 926-927.)  Other than Petitioner's testimony that the briefcase contained evidence of the bank robbery (Trial II Tr. VI, ECF No. 26, p. 871-872), there was no evidence regarding the content of Petitioner's briefcase that night.

"It is improper for a prosecutor, during closing arguments, to bring to the attention of the jury any 'purported facts that are not in evidence and are prejudicial'" *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) citing *United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1995).  Nonetheless, "prosecutors 'must be given leeway to argue reasonable inferences from the evidence.'" *Id.* citing *United States v. Collins*, 78 F.3d 10021, 1040 (6th Cir. 1996).

In *Byrd*, 209 F.3d at 486, the defendant was accused of murder.  The state had recovered some of the clothing related to the crime, but there was a shirt sleeve missing.  During closing the prosecutor argued: "we are missing a sleeve, and I will tell you where that sleeve is.  It is out in Hamilton County in the northwest side with blood all over it." *Id.* at 536.  The Sixth Circuit  determined that the statement constituted an arguably reasonable inference from the evidence presented.  *Id.*

In *United States v. Cosgrove*, 637 F. 3d 646 (6th Cir. 2011), the prosecutor had introduced into evidence certain shredded documents.  In closing argument, the prosecutor argued that (1) the documents were likely papers from the fraudulent companies; (2) the defendant had previously stored them at his home; and (3) defendant disposed of them in the dumpster behind his office. *Id.* at 663.  The documents had not been reconstructed; thus, the evidence did not link them to the fraudulent companies that were the subject of the criminal prosecution and, apparently, the record did not include evidence regarding where the documents had been stored or who placed them in the dumpster.  Defendant contended the argument presented facts not in evidence.  The court concluded "the prosecutor's statements

about the documents represented reasonable inferences that could be drawn from the appearance of

shredded materials in Cosgrove's dumpster four days after his offices were searched." *Id.* at 664.

The trial court's resolution of Petitioner's challenge is consistent with the *Byrd* and

*Cosgrove* decisions:

> The Defendant next alleges that the Prosecutor argued facts not in evidence during his
> closing argument. During the trial, there was evidence presented that the victim's briefcase
> was taken at the same time as the murder. There was evidence presented that the
> Defendant knew that the victim kept a large amount of cash and a .44-caliber handgun in
> the briefcase. There was also evidence presented that this briefcase was found in a
> dumpster and it contained a holster and ammunition, but no gun or money. Finally, there
> was evidence presented that the Defendant called Laura Schmidt, his roommate at the time
> of the murder, to tell her that the police would be coming by their house and asked her to
> move his briefcase (not the victim's) to the trunk of his car. The gun and the money were
> never found. During his closing, the Prosecutor argued that the Defendant asked Schmidt
> to move his briefcase because he placed the money and the gun in his own briefcase.
> Again, the Prosecutor was making a reasonable inference–that the Defendant put the
> money and gun in his own briefcase–based on the evidence. Therefore, there was no
> prosecutorial misconduct.

(Op. and Order, ECF No. 35, p. 9-10.)

Petitioner has not identified any clearly established federal law that the trial court's

determination is contrary to or inconsistent with. Petitioner notes that there was no evidence showing that

the briefcase contained the missing cash and gun. Beyond that, however, Petitioner does not present

evidence that the court of appeals' factual determination–that the prosecutor was making a reasonable

inference–is unreasonable. The inference urged by the prosecutor here is no greater logical stretch than

the inferences argued and deemed appropriate in *Byrd* or *Cosgrove*. Petitioner's contention that the

prosecutor's argument violated his due process rights has no merit.

C.    Cumulative effect of prosecutorial misconduct

-48-

Finally, Petitioner argues that if the individual instances of prosecutorial misconduct were not sufficient to render his trial fundamentally unfair, certainly their cumulative effect would. Where there were no instances of misconduct, this argument carries no weight. Meritless individual claims of error cannot by accumulation create constitutional infirmity. *See Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004) ("[T]he accumulation of non-errors cannot collectively amount to a violation of due process.") (internal quotation omitted).

> VI.   Ineffective assistance of appellate counsel
>        (Habeas issue XI)

Finally, Petitioner contends his appellate counsel was ineffective for failing to raise the issues Petitioner raised in his MICH. CT. R. 6.500 motion, habeas issues VI-X. The Michigan Court of Appeals rejected each claim of ineffective assistance of appellate counsel:

> The Defendant alleges that his appellate counsel was ineffective for failing to raise all of the issues that the Defendant has raised in this Motion. As explained above, all of the Defendant's arguments are without merit. Therefore, his appellate counsel was not ineffective for failing to raise these issues. Appellate counsel does not need to raise every possible appellate claim, and may be selective as a matter of discretion and strategy when choosing which meritorious issues to raise on appeal. *People v. Reed*, 449 Mich. 375, 397, [535 N.W.2d 496, 508-09] (1996).

(Op. and Order, ECF No. 35, p. 11.) As the Michigan Court of Appeals recognized, counsel's failure to raise a meritless issue does not constitute ineffective assistance of counsel. *See Smith*, 591 F.3d at 523; *O'Hara*, 499 F.3d at 506; *Chegwidden*, 92 F. App'x at 311; *Harris*, 204 F.3d at 683. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).

As set forth above, as a matter of federal constitutional law, the issues Petitioner claims his counsel failed to raise have no merit. Based on the Michigan Court of Appeals analysis, the same is true with respect to Petitioner's claims as a matter of state law. Accordingly, Petitioner's ineffective assistance claims have no merit.

VII.   Procedural default

"If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention–whether in trial, appellate, or habeas proceedings, as state law may require–procedural default will bar federal review." *Magwood v. Patterson*, 561 U.S. 320, 130 S. Ct. 2788, 2801 (2010). Nevertheless, the U.S. Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423 24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). See also 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Hudson*, 351 F.3d at 215-16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999). Accordingly, though Respondent argues

-50-

habeas review of certain issues is barred by Petitioner's procedural default, the Court has resolved the claims on the merits.

## **Conclusion**

In light of the foregoing, the Court will deny Petitioner's application because it fails to present a meritorious federal claim.

**Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This Court's dismissal of Petitioner's action under Rule 4 of the Rules Governing § 2254 Cases is a determination that the habeas action, on its face, lacks sufficient merit to warrant service. It would be highly unlikely for this Court to grant a certificate, thus indicating to the Sixth Circuit Court of Appeals that an issue merits review, when the Court has already determined that the action is so lacking in merit that service is not warranted. *See Love v. Butler*, 952 F.2d 10 (1st Cir. 1991) (it is "somewhat anomalous" for the court to summarily dismiss under Rule 4 and grant a certificate); *Hendricks v. Vasquez*, 908 F.2d 490 (9th Cir. 1990) (requiring reversal where court summarily dismissed under Rule 4 but granted certificate); *Dory v. Comm'r of Corr. of New York*, 865 F.2d 44, 46 (2d Cir. 1989) (it was "intrinsically contradictory" to grant a certificate when habeas action does not warrant service under Rule 4); *Williams v. Kullman*, 722 F.2d 1048, 1050 n.1 (2d Cir. 1983) (issuing certificate would be inconsistent with a summary dismissal).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated:   November 1, 2016            /s/ Paul L. Maloney
                                     Paul L. Maloney
                                     United States District Judge